IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JENNIFER GUIST                                              PLAINTIFF

V.                                  NO. 10-5212

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration          DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Jennifer Guist, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying her claim for a period of disability and disability insurance benefits

(DIB) under the provisions of Title II of the Social Security Act (Act).  In this judicial review,

the Court must determine whether there is substantial evidence in the administrative record to

support the Commissioner's decision.  See 42 U.S.C. § 405(g).

**I.      Procedural Background:**

Plaintiff, Jennifer Guist, filed her current application for DIB on September 18, 2008,

alleging an inability to work since September 1, 2006, due to anxiety, anorexia, right knee

problems, and asthma.  (Tr. 103-105, 121, 124).   Plaintiff maintained insured status through

June 30, 2010.  (Tr. 121).  An administrative hearing was held on January 6, 2010, at which

Plaintiff appeared with counsel and testified.  (Tr. 26-53).

By written decision dated March 25, 2010, the ALJ found that Plaintiff had the following

severe impairments: a history of generalized anxiety, asthma, and right knee pain.  (Tr. 12).

However, after reviewing all of the evidence presented, he determined that Plaintiff's

-1-

impairments did not meet or equal the level of severity of any impairment listed in the Listing

of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 12). The ALJ found

Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b), except the
> claimant can occasionally lift and/or carry 20 pounds and frequently 10
> pounds. She can sit for 6 hours in an 8-hour workday and stand and/or
> walk for 6 hours. She must avoid concentrated exposure to fumes, odors,
> dusts, and gases. She can frequently handle, but fingering is not limited.
> She can perform work where interpersonal contact is incidental to the
> work performed; complexity of tasks is learned and performed by rote,
> with few variables and little judgment required. Supervision required is
> simple, direct, and concrete.

(Tr. 14). With the help of a vocational expert (VE), the ALJ determined Plaintiff could not

perform any past relevant work, but would be able to perform such jobs as callout operator,

office clerk, and counter clerk. (Tr. 19).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which

denied that request on September 7, 2010. (Tr. 1-3). Subsequently, Plaintiff filed this action.

(Doc. 1). This case is before the undersigned pursuant to the consent of the parties. (Doc. 6).

Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 10, 11).

## II.    Evidence Presented:

Plaintiff was born in 1966, completed the 12th grade in school, and at one time was a

licensed practical nurse. (Tr. 121, 131). A good portion of the medical records reflect that at

least as early as April of 2006 through January of 2009, Plaintiff presented herself numerous

times to emergency room departments complaining of dental pain, for which she received pain

medication. (Tr. 204, 215, 221, 227, 239, 250, 266, 269, 275, 278, 281, 284, 292, 295, 316, 321,

326, 366, 356, 362, 389, 493, 498, 503, 523, 649). During the visit on July 11, 2006, it was

AO72A
(Rev. 8/82)

reported that there was some concern Plaintiff may have a controlled medication problem, that she was requesting more narcotics, and was told that she would receive a less sedating pain medicine. (Tr. 227). On December 11, 2007, when Plaintiff presented herself to Washington Regional Medical Center complaining of a dental infection, the report indicates that Plaintiff was asking specifically for Lortab. (Tr. 295). It was explained to Plaintiff that since September 13, 2007, she had been prescribed 100 tablets of 7.5/500 Lortab for the same tooth that she had not gotten fixed, and that they would no longer be supplying Plaintiff with narcotics for her chronic tooth pain. (Tr. 295). In a report dated February 29, 2008, it was reported that Plaintiff presented to the emergency room with tooth pain that "has been on-going for several weeks. Pt. has been seen in the ER on numerous occasions for the same problem. States that she has appt with dentist on Monday but pain is too bad to wait. States that Darvocet is not strong enough." (Tr. 282).

On April 30, 2006, Plaintiff presented herself to Northwest Medical Center of Washington County for a left hand injury as a result of catching her hand in the car door. (Tr. 244). X-rays of the hand revealed no evidence of acute injury involving the left hand and left wrist. (Tr. 249).

On August 26, 2006, Plaintiff presented herself to Washington Regional Medical Center for a CT of her abdomen & pelvis, since she had been complaining of right lower quadrant pain. (Tr. 263). It was found that there may be one or two tiny indistinct papiliary calcifications/stones, but no distinct or obstructive urinary tract stones were detected. (Tr. 263). There was no indication of bowel obstruction, no free air, there were cholecystectomy clips, and no acute noncontrast aortic abnormalities. (Tr. 263). The lung bases were also clear.

-3-

On January 2, 2007, Plaintiff went to Washington Regional Medical Center complaining of tingling in her arms and hands. (Tr. 378). She said they had been tingling off and on for one month. (Tr. 378). She also stated that she was out of all of her prescriptions, which she thought might be related. She reported that she owed her clinic $76.00, so they would not let her see a doctor to get her medicine. (Tr. 378). The doctor's notes indicate that he was hesitant to restart medications, "as patient has demonstrated poor followup." (Tr. 378). The final diagnosis at that time was anxiety. (Tr. 382). It was also noted that Plaintiff had tried to cut back on cigarettes, and believed she smoked 1 to 1 ½ packs every two days. (Tr. 384).

On January 24, 2007, Plaintiff presented to Washington Regional Medical Center complaining of "bilateral, lower, middle, back injury, back pain, back tenderness, decreased back use." (Tr. 372). She reported she was moving furniture and hurt her lower back, and the pain radiated into her right leg when she walked. (Tr. 372).

On February 22, 2007, Plaintiff presented herself to Northwest Medical Center, complaining of cough and congestion, and on February 23, 2007, she presented with right shoulder pain after a fall. (Tr. 232, 235). The clinical impression was shoulder contusion (right). (Tr. 235).

On February 27, 2007, Plaintiff presented herself to Washington Regional Medical Center for evaluation of a fall, complaining of chest/rib pain. (Tr. 347). X-rays of her chest revealed no fracture identified. (Tr. 354).

On April 25, 2007, Plaintiff presented herself to Washington Regional Medical Center, and was diagnosed with a urinary tract infection. (Tr. 333-337).

On November 12, 2007, Plaintiff presented herself to Washington Regional Medical

-4-

Center, complaining of right knee pain. (Tr. 309). She was diagnosed with joint effusion - knee. (Tr. 311). On November 14, 2007, Plaintiff presented to Northwest Medical Center with right knee pain, and the clinical impression was knee sprain. (Tr. 209, 213, 579). On that same day, x-rays of Plaintiff's right knee revealed a negative study. (Tr. 214).

On November 27, 2007, Plaintiff presented herself to Washington Regional Medical Center, complaining that her ACL (anterior cruciate ligament) was hurting, and that it had popped again the previous night when she was moving into a new place. (Tr. 302). Plaintiff was diagnosed with knee injury [unspecified], splinting was indicated for pain, and a knee immobilizer was applied. (Tr. 302).

On February 12, 2008, Plaintiff presented herself to Washington Regional Medical Center, complaining that she "flipped" her bike and injured her left hand. (Tr. 287). X-rays of the hand showed no fractures, no dislocations, no foreign bodies, no bony lesions, no degenerative joint disease, and no soft tissue swelling. (Tr. 289, 291).

On October 27, 2008, a Mental Diagnostic Evaluation was conducted by Dr. Terry L. Efird. (Tr. 410-414). Dr. Efird noted that financial obstacles to treatment were reported. (Tr. 411). He also reported that the ability to perform basic self-care tasks satisfactorily was endorsed, that Plaintiff's ability to perform household chores satisfactorily was primarily endorsed, although Plaintiff talked about physical pain in a knee if standing for long periods of time. (Tr. 411). Plaintiff reported that her driver's license was suspended about five years previously, and denied having the money to have it reinstated. Plaintiff also reported having spent about two months in jail recently, secondary to not having shown up for court, associated with child support. (Tr. 411). Plaintiff reported using alcohol occasionally, but reported that she

-5-

had not consumed alcohol in about four months. (Tr. 411). Dr. Efird diagnosed Plaintiff as follows:

| | |
|---|---|
| Axis I: | generalized anxiety disorder |
| Axis II: | deferred |
| Axis V: | 50-60 (GAF) |

(Tr. 413). He further found that Plaintiff was able to shop independently, her ability to perform most activities of daily living satisfactorily appeared primarily adequate, with some knee pain reported, and social interactions were described as seeing her children every other weekend. (Tr. 413). Dr. Efird found Plaintiff had the capacity to perform basic cognitive tasks required for basic work like activities, although he noted that she would likely have some degree of difficulty on more complex types of cognitive tasks. (Tr. 413). He reported no remarkable difficulties with attention/concentration or persistence. (Tr. 413).

On October 29, 2008, a Mental RFC Assessment was completed by non-examining consultant, Dr. Kay Cogbill. (Tr. 419-422). Dr. Cogbill found Plaintiff to be moderately limited in 7 out of 20 categories and not significantly limited in 13 out of 20 categories. (Tr. 421). She further found that Plaintiff was able to perform work where interpersonal contact was incidental to the work performed, e.g. assembly work, where complexity of tasks was learned and performed by rote, with few variables and little judgment, and where supervision required was simple, direct and concrete - "unskilled." (Tr. 421). Dr. Cogbill also completed a Psychiatric Review Technique form on October 29, 2008, and found that Plaintiff had a mild degree of limitation in restriction of activities of daily living; a moderate degree of limitation in difficulties in maintaining social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 433). She further found that the medical evidence supported

-6-

a diagnosis of generalized anxiety disorder, but that there was no evidence of marked or severe impairment.  (Tr. 435).

On November 6, 2008, a General Physical Examination was performed by Dr. C.R. Magness.  (Tr. 446-451, 511-516).  Dr. Magness found Plaintiff had 130 degree range of motion in her right shoulder forward elevation and knee flexion (normal range is 0 - 150).  (Tr. 448). He found her lumbar spine flexion to be 70 degrees (normal range is 0- 90).  Dr. Magness found Plaintiff to have 50% grip in her right hand and 75% in her left hand, and that she squatted/arose poorly from a squatting position.  (Tr. 449).  He diagnosed Plaintiff with:

> Asthma - tobacco use
> Anxiety disorder - Hx anorexia
> DJD(degenerative joint disease) - right shoulder and right knee
> De Quervain's[1]  tendonitis right thumb
> Illegible

(Tr. 450).  Dr. Magness further found that Plaintiff had moderate to severe limitation in her ability to handle, and moderate limitation in her ability to walk and carry.  (Tr. 450).

On November 7, 2008, a Physical RFC Assessment was completed by non-examining physician, Lucy Sauer.  (Tr. 455- 462).  Dr. Sauer found that Plaintiff could occasionally lift and/or carry (including upward pulling) 50 pounds; frequently lift and/or carry (including upward pulling) 25 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry.  (Tr. 456).  Dr. Sauer found that no postural, manipulative, visual, or

---

[1]De Quervain's disease - Painful tenosynovitis due to relative narrowness of the common tendon sheath of the abductor pollicis longus and the extensor pollicis brevis.  Id. at 539.

communicative limitations were established, and that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 457-459). Owing to the asthma and considering the medical evidence of record, Dr. Sauer found that Plaintiff would be capable of medium work, "with avoidance of concentrated dust/fumes." (Tr. 462).

On December 22, 2008, Plaintiff presented herself to Ozark Guidance, Inc. (Tr. 597-601). Plaintiff reported to Donald Defreece, MS, LPC, that she was having a lot of emotional problems with recent stressors, complained of anger problems, anxiety, and sadness since being in jail for contempt of court regarding non-payment of child support. (Tr. 597). She reported drinking weekly "whiskey" and complained of becoming violent when drinking. (Tr. 597). She reported taking Zoloft for three to four months in 2002 for anxiety/mood with some improvement. (Tr. 597). Mr. Defreece found Plaintiff's attention and concentration to be "fair," and her overall judgment to be "impaired/abnormal/poor." (Tr. 599).

On December 23, 2008, Dr. Edwin C. Jones, of Ozark Guidance, Inc. diagnosed Plaintiff as follows:

| | |
|---|---|
| Axis I | Adjustment d/o w mix anxiety & dep. mood |
| | Alcohol abuse |
| Axis II | Diagnosis Deferred on Axis II |
| Axis III | Asthma unspecified |
| Axis IV | Occupational problems |
| | Problems related to interaction with the legal system/crime |
| Axis V | Current GAF - 55 |

(Tr. 602).

On January 22, 2009, Plaintiff saw Dr. Ardell William Diessner at Ozark Guidance, Inc., complaining of anxiety. (Tr. 605). It was reported that Plaintiff spent 60 days in jail for not paying child support, that she had been drinking, and when the police officer approached her, she

-8-

hit him and broke his nose. (Tr. 605). She reported she was in a blackout and had no

recollection. She reported becoming quite distressed four years previously when her ex-husband

gained custody of her children. Dr. Diessner diagnosed Plaintiff as follows:

| | |
|---|---|
| Axis I: | Impulse Disorder |
| | Alcohol abuse |
| Axis II: | Deferred |
| Axis III: | Cholecystectomy,[2] cervical disc post car wreck |
| Axis IV: | Stressors severe, loss of children and alcohol abuse |
| Axis V: | Level of function - 30 |

(Tr. 606). On January 29, 2009, Plaintiff reported to Dr. Diessner that she was calmer and was

able to sit and watch a television show, and that her impulsivity and focusing improved. (Tr.

608).

On February 24, 2009, Dr. Diessner reported that Plaintiff said she did quite well on

"Methylphenidate 10/10." (Tr. 609).

On March 12, 2009, Dr. Diessner completed a Mental RFC Assessment - Short form.

(Tr. 595). In the form, Dr. Diessner checked all of the abilities listed in which Plaintiff either had

poor ability or was markedly limited, which are: understanding, remembering, and carrying out

simple instructions; making simple work-related decisions; dealing with changes in a routine

work setting; responding appropriately to supervision, co-workers, and usual work settings;

maintaining socially appropriate behavior and adhering to basic standards of neatness and

cleanliness; behaving in "an emotionally stable manner or related predictably in social situation;"

working within a schedule, maintaining regular attendance, and being punctual within customary

tolerances; demonstrating reliability; completing a normal workday and workweek without

---

[2]Cholecystectomy - Surgical removal of the gallbladder. Dorland's Illustrated Medical Dictionary 354 (31st ed. 2007)

AO72A
(Rev. 8/82)

interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. (Tr. 595). Dr. Diessner also diagnosed Plaintiff with attention deficit disorder in this form. (Tr. 595).

On March 22, 2009, Plaintiff presented herself to Washington Regional Medical Center, complaining that she fell in the bathroom and her right hip struck the edge of the shower. (Tr. 485). X-rays of the pelvis with lateral view of the right hip revealed no acute fracture or malalignment and a focal, benign appearing sclerotic lesion with the proximal metaphysis of the left femur, unchanged from a prior examination on September 9, 2004. (Tr. 4910. X-rays of the lumbosacral spine revealed no acute fracture or malalignmernt, and mild multi-level degenerative disc disease. (Tr. 492).

On March 24, 2009, Plaintiff saw Dr. Diessner at Ozark Guidance, Inc. (Tr. 610). At that time, Dr. Diessner diagnosed Plaintiff as follows:

| | |
|---|---|
| Axis I: | Adjustment d/or w mix anxiety & dep mood |
| | Alcohol abuse |
| Axis II: | Diagnosis deferred on axis 2 |
| Axis III: | Asthma unspecified |
| Axis IV: | Occupational problems |
| | Problems related to interaction with the legal system/crime |
| Axis V: | Current GAF - 55 |

(Tr. 610).

On April 1, 2009, Dr. Diessner completed a Mental RFC Assessment, wherein he stated that Plaintiff had no useful ability to function on a sustained basis in 23 different categories. (Tr. 596). Dr. Diessner, a psychiatrist, also completed a Physical RFC Assessment - Short Form, on April 1, 2009. (Tr. 613). Dr. Diessner checked all of the boxes, indicating that Plaintiff: could not sit for six hours of an eight hour work-day; could not sit/stand/walk in combination for eight

-10-

hours in an eight hour work-day; could not perform part-time work activities of any nature for more than ten hours in a forty hour work-week; required four or more unscheduled work breaks in an eight hour work-day due to physical restriction; had significant limitations in the ability to reach/push/pull bilaterally in the upper extremities; and had significant limitations in the ability to handle and work with small objects with both hands. (Tr. 613). Dr. Diessner indicated that Plaintiff suffered with these limitations for many years, "worse last 6 months." (Tr. 613).

Dr. Diessner also completed a Physical Medical Source Statement on April 1, 2009, wherein he gave Plaintiff the lowest abilities in all categories. (Tr. 614). He listed instability and history of injury as the clinical and laboratory findings or symptoms from which the limitations were concluded. (Tr. 615). Dr. Diessner diagnosed Plaintiff with impulse disorder and alcoholism. (Tr. 615).

Over the period of three months, from April 23, 2009 to June 15, 2009, Dr. Diessner saw Plaintiff monthly, and noted that Plaintiff reported that with Ritalin her mood went up, she was able to concentrate and "do her things better." (Tr. 527). Plaintiff reported that she became sleepy on Citalopram and was not able to function, and Dr. Diessner noted that Plaintiff was less impulsive on low dose Methylphenidate. (Tr. 528). On June 15, 2009, Plaintiff reported to Dr. Diessner that with taking 5 mg. Methylphenidate in the morning, she received the organization/emotional boost so that she was able to function "pretty much throughout the day." (Tr. 529).

On July 30, 2009, Plaintiff presented herself to Washington Regional Medical Center, complaining of right knee pain. (Tr. 475, 621). She had twisted her right knee a couple of days previously, and reported it had been hurting and she had been having trouble sleeping. It was

-11-

also noted that she was a heavy smoker, smoking 1 ½ packs per day for 21 years, and that she consumed alcohol socially. (Tr. 476).

On August 22, 2009, Plaintiff again presented herself to Washington Regional Medical Center, for evaluation of right knee pain. (Tr. 666). She reported re-aggravating her knee the night before. She reported moderate pain, and was diagnosed with knee sprain. (Tr. 666-667).

On September 4, 2009, Dr. Maria C. Melo, from Ozark Guidance, Inc., saw Plaintiff. (Tr. 673-674). Dr. Melo reported that Plaintiff presented in great distress, reporting progressive depression during the previous few months. It was reported that she continued to drink almost daily, one pint of liquor, often to the point of intoxication. (Tr. 673). Plaintiff denied the use of drugs, but continued to smoke cigarettes in the amount of two packs per day. (Tr. 673). Plaintiff also reported significant anxiety. Dr. Melo reported that Plaintiff smelled some of alcohol, was dysphoric and tearful throughout the assessment. However, Dr. Melo reported that there were no cognitive deficits, but that she seemed to have some intermittent memory deficits. (Tr. 673). Dr. Melo reported that Plaintiff's attention seemed intact and there was no evidence of psychosis. (Tr. 673). Dr. Melo diagnosed Plaintiff with Major Depressive Disorder, Recurrent; alcohol abuse versus dependence; questionable history of Attention Deficit Disorder, and Nicotine dependence. She stated that Plaintiff presented with progressive depressive symptoms, significant alcohol abuse and some psychotic symptoms, which Dr. Melo believed was a side effect of Methylphenidate. (Tr. 673). Dr. Melo assessed Plaintiff a GAF score of 54, and strongly advised Plaintiff to discontinue the use of alcohol. Smoking cessation counseling was also given. (Tr. 673).

On October 15, 2009, Plaintiff presented to Washington Regional Medical Center, stating

-12-

that she was out of her inhaler. (Tr. 653). She also stated she was out of Lortab. (Tr. 653).

On November 11, 2009, Plaintiff again saw Dr. Melo at Ozark Guidance, Inc. (Tr. 675). The Cymbalta that Dr. Melo had previously prescribed was not helping, and Plaintiff reported still feeling depressed, and continued to drink a significant amount of alcohol very frequently. (Tr. 675). Plaintiff had become intoxicated two weeks prior, had a blackout, and ended up spending the night at an abandoned house in her neighborhood while her family was looking for her. Plaintiff reported to Dr. Melo that she had cut down significantly and was now drinking maybe one or two drinks every other day. (Tr. 675). Dr. Melo reported that she was less dysphoric, there was no clear evidence of inattention, and she did not have any memory deficits. Plaintiff complained of problems with her joints, chronic back and neck pain. Dr. Melo diagnosed Plaintiff with Major Depressive Disorder, recurrent, alcohol abuse v. dependence, and nicotine dependence, and gave Plaintiff a GAF score of 56. (Tr. 675). She also strongly advised Plaintiff to stop consuming alcohol, and reported that she did not think it was indicated or safe for Plaintiff to use stimulants. (Tr. 676).

In an Undated Disability Report - Adult, Plaintiff reported that her knees swelled a lot, mostly in the winter, although she reported having pain all the time, had trouble breathing, and had trouble dealing with people. (Tr. 125). In a September 29, 2008 pain report, Plaintiff reported that she had pain located in her right knee and right shoulder, had pain when walking or standing for long periods, and that bending, walking, sitting and lifting caused pain. (Tr. 141). In a September 29, 2008 Function Report - Adult, Plaintiff reported that she went to church to get food when needed, took care of her pets, could take care of her personal needs, did cleaning, laundry, dishes, and used the sweeper, resting in between the duties. (Tr. 143-145). She reported

-13-

that she could walk 30 minutes before needing to stop and rest, that she could pay attention for 5 seconds, and did not finish what she started.  (Tr. 148).  In an Undated Disability Report - Appeal, Plaintiff reported having more anxiety and needing to be on medications, but could not afford them.  (Tr. 1600-163).

At the hearing held on January 6, 2010, Plaintiff testified that she was no longer drinking and that the only thing she was taking was her medicine.  (Tr. 40).  She testified that she considered her primary problems to be mental.  (Tr. 41).  She reported that she had panic attacks mostly every day and was depressed.  (Tr. 43, 45).  She testified that on a typical day, she would cook easy things, clean house and sweep a little bit.  (Tr. 46-47).  She testified that her hip continued to bother her sometimes when she was walking across the floor, and that her focus and concentration was "not worth anything."  (Tr. 48).

## III.   Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from

-14-

the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity (RFC).  See McCoy v. Schneider, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

-15-

IV.     **Discussion:**

Plaintiff raises the following grounds on appeal: 1) Whether the ALJ erred in assessing the credibility of Plaintiff's subjective complaints; 2) Whether the ALJ erred in failing to find Plaintiff's diagnosis of degenerative joint disease, De Quervain's tendonitis, Adjustment Disorder with Mixed Anxiety and Depressed Mood, Impulse Disorder, and Major Depressive Disorder, Recurrent, were severe impairments; 3) Whether the ALJ erred in making his RFC determination;  4) Whether the ALJ erred in failing to fairly and fully develop the record; and 5) whether the ALJ erred in finding that jobs existed in significant numbers which Plaintiff could perform.  (Doc. 10 at p. 2).

**A.  Severe Impairments**

Plaintiff contends that her degenerative joint disease, De Quervain's tendonitis, Adjustment Disorder with Mixed Anxiety and Depressed Mood, Impulse Disorder, and Major Depressive Disorder, Recurrent, were severe impairments.  However, the record establishes that these impairments did not have more than a minimal effect on Plaintiff's ability to work.

An impairment is severe within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § § 1520(a)(4)ii), 416.920(a)(4)(ii).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § § 404.1521, 416.921.  The Supreme Court has adopted a "de minimis standard" with regard to the severity standard.  Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cri. 1989).

First, the Court notes that Plaintiff did not allege these impairments in her disability

-16-

report.  See Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003)(ALJ was not obligated to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability); Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996)(claimant did not allege depression in his application or during his testimony - ALJ has no obligation to investigate a claim not presented at the time of application and not offered at the hearing as a basis for disability).  Although Plaintiff stated at the hearing that she was depressed and did not like being around people much, the objective evidence supports the fact that this was interrelated to the anxiety disorder, which he ALJ found to be severe.

Furthermore, Plaintiff failed to present sufficient proof that these impairments were severe.  As to Plaintiff's degenerative joint disease, Dr. Magness, upon examination of Plaintiff, found that Plaintiff had degenerative joint disease in her right shoulder and right knee.  However, he found Plaintiff had only moderate limitations in her ability to walk and carry.  In addition, Plaintiff testified at the hearing that she considered her primary problems to be mental.

As to Plaintiff's De Quervain's tendonitis, Dr. Magness noted that Plaintiff had pain in her right thumb, and that she had 50% grip in her right hand and had moderate to severe limitation in her ability to handle.  However, there is nothing in the medical evidence indicating that Plaintiff's thumb impairment was so severe as to have more than a minimal effect on her ability to work.  In addition, the jobs that the ALJ found Plaintiff would be able to perform require only handling occasionally.  Dictionary of Occupational Titles, § § 237.367-014, 205.367-030, 249.366-010.

With respect to Adjustment Disorder with Mixed Anxiety and Depressed Mood, Impulse Disorder, and Major Depressive Disorder, Recurrent, both Dr. Efird and Dr. Cogbill diagnosed

-17-

Plaintiff with generalized anxiety disorder, which the record supports.  The ALJ discussed Plaintiff's mental impairments at length in his decision, noting that although Plaintiff presented to Dr. Diessner in September of 2009 with depressive symptoms, she was assessed with a GAF of 54.  As stated by the ALJ, a GAF from 51 to 60 indicates only moderate symptoms or moderate difficulty in social or occupational functioning.  Diagnostic and Statistical Manual of Mental Disorders, at p. 32 (4th ed. 2000).  On November 11, 2009, although Dr. Melo diagnosed Plaintiff with major depressive disorder, recurrent, she noted that Plaintiff was less dyshporic, there was no clear evidence of inattention and she did not have any memory deficits.  Dr. Melo gave Plaintiff a GAF score of 56.  Dr. Diessner is the only physician who diagnosed Plaintiff with impulse disorder, and, as will be more fully discussed below, the Court believes Dr. Diessner's opinion should be given little weight.  Dr. Melo started Plaintiff on Cymbalta to treat the depression as well as pain, but Plaintiff did not tolerate the Cymbalta well.  Therefore, Dr. Melo started Plaintiff on Fluoxetine, to which Plaintiff had a good response in the past.

The Court believes there is sufficient evidence to support the conclusion that these impairments do not rise to the level of severe impairments, based upon the entire record as a whole.

### B.  Subjective Complaints and Credibility Analysis

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not

-18-

AO72A
(Rev. 8/82)

discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment. After reviewing the administrative record, it is clear that the ALJ properly evaluated Plaintiff's subjective complaints.

The ALJ determined that in activities of daily living, Plaintiff had only mild restriction, since Plaintiff reported she was able to maintain her personal hygiene without any difficulty.  The record reflects that Plaintiff also cleaned, did the laundry, dishes, and ran the sweeper, although she stated she needed to rest in between the chores.  The record also reflects that Plaintiff was able to care for her personal needs.

Regarding Plaintiff's knee problems, it is noteworthy that Plaintiff indicated that her knee problems mainly bothered her in the winter months.  In addition, x-rays of Plaintiff's right knee in November of 2007 reflected a negative study.  Dr. Magness reported Plaintiff had 130 degrees range of motion in her right knee flexion, and that she had degenerative joint disease in her right knee.  However, he found that she had only moderate limitation in her ability to walk.  On August 22, 2009, Plaintiff was diagnosed with knee sprain, and it was noted that she was ambulating fairly well.  Plaintiff denied that the knee ever seemed to give way on her.  At the hearing,

-19-

Plaintiff testified that her right knee hurt and that she had some cartilage that was "popping in there and deteriorating." (Tr. 49). Although Plaintiff may suffer from some right knee pain, the objective medical records support the ALJ's finding that her right knee impairment was not disabling.

With respect to Plaintiff's asthma, the ALJ found that the records did not show Plaintiff experienced episodes of severe asthma attacks at the frequency required for a finding of presumptive disability under this medical listing. The ALJ further found that Plaintiff's asthma did not meet or medically equal listing 3.03, because Plaintiff did not have the requisite pulmonary function deficits or frequency of attacks, and that the condition appeared to be adequately controlled with medications. Although Plaintiff was diagnosed with asthma, the majority of the medical records relate to other conditions from which Plaintiff allegedly suffered rather than any issues relating to her asthma. The records also indicate that the use of an inhaler controlled her asthma. In addition, throughout the relevant time period, Plaintiff continued to smoke anywhere from one to two packs of cigarettes per day. The ALJ was allowed to consider Plaintiff's failure to stop smoking when making her credibility determination in this case. See Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008).

Regarding Plaintiff's anxiety, the ALJ found that with respect to social functioning and concentration, persistence or pace, Plaintiff had moderate difficulties, and had no episodes of decompensation. The record supports both of these findings. Although Plaintiff does not like to be in crowds, she does spend time with her children, can shop independently, and went to church for food on a regular basis. By November 11, 2009, Plaintiff was reported as less dysphoric, there was no clear evidence of inattention, and she did not have any memory deficits. Prior to that, Dr.

-20-

Efird found Plaintiff was able to communicate and interact in a reasonably socially adequate manner, and had the capacity to perform basic cognitive tasks required for basic work like activities.

The Court also notes that the record contains Plaintiff's contention at various times that she was unable to afford medications or the cost of having her driver's license reinstated. However, Plaintiff was apparently able to afford cigarettes and alcohol throughout the relevant time period.

Therefore, although it is clear that Plaintiff suffered from some degree of pain, asthma, and anxiety, she has not established that she was unable to engage in any gainful activity during the relevant time period.  See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)(holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)(holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).  Neither the medical evidence nor the reports concerning her daily activities support Plaintiff's contention of total disability.  Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

**C.  RFC Assessment:**

RFC is the most a person can do despite that person's limitations.  20 C.F.R. §404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes medical records, observations of treating physicians and others, and the claimant's own description of her limitations.  Guilliams, 393 F.3d at 801;  Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into

-21-

the assessment.  20 C.F.R. § 404.1545(a)(3).  The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace."  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "The ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."  Id.

In the present case, the ALJ considered the medical assessments of examining agency medical consultants, treating physicians, and Plaintiff's subjective complaints when he determined Plaintiff could perform light work with certain limitations.  In making this RFC determination, the ALJ gave little weight to the opinion of non-examining consultant Dr. Lucy Sauer, who found Plaintiff able to do medium work, stating that she failed to fully consider the Plaintiff's subjective complaints and the combined effects of Plaintiff's impairments.  He also gave little weight to the opinions of treating psychiatrist, Dr. Diessner, finding that his opinion was not supported by the evidence of record and was inconsistent with the other experts that reviewed the record.  He additionally noted that Dr. Diessner's specialty was psychiatry, and that his determination regarding Plaintiff's physical capacity was without support of any clinical findings.   The ALJ gave significant weight to the opinion of Dr. Kay Cogbill, a State agency's psychological consultant, stating that it was consistent with the record as a whole and was therefore persuasive with respect to Plaintiff's mental residual functional capacity.

"A treating source's opinion is to be given controlling weight where it is supported by acceptable clinical and laboratory diagnostic techniques and where it is not inconsistent with other substantial evidence in the record."  Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir.2003),

-22-

paraphrasing 20 C.F.R. § 404.1527(d)(2).  However, in the present case, it is clear that Dr. Diessner's opinion regarding Plaintiff's mental residual functional capacity is totally inconsistent with other substantial evidence in the record.  In his Mental RFC Assessment - Short Form, dated March 12, 2009, Dr. Diessner checked nine of the twelve boxes on the one-page form, which are supposed to reflect Plaintiff's abilities that are "either poor ability or markedly limited."  (Tr. 595).  He also diagnosed Plaintiff with Attention Deficit Disorder.  In his Mental RFC Assessment dated April 1, 2009, Dr. Diessner checked all of the boxes which are supposed to reflect the areas in which Plaintiff "has no useful ability to function on a sustained basis which is defined as an eight hour work day for five days in a full work week."  (Tr. 596).  It has been held that  "[a] treating physician's checkmarks on an MSS form are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record."  Martise v. Astrue 641 F.3d 909, 926 (8th Cir. 2011).  When a treating source's opinion is not controlling, it is weighed by the same factors as any other medical opinion: the examining relationship, the treatment relationship, supporting explanations, consistency, specialization, and other factors. See 20 C.F.R. § 404.1527(d).

More specifically, Dr. Terry Efird, who conducted a mental diagnostic evaluation on October 27, 2008, found Plaintiff had the capacity to perform basic cognitive tasks required for basic work like activities,  no remarkable difficulties with attention/concentration were noted, and no remarkable problems with persistence were noted.  He diagnosed her with generalized anxiety disorder, and stated that Plaintiff had the ability to shop independently, had the ability to perform most activities of daily living satisfactorily, and saw her children every other weekend, although otherwise maintained having been socially isolated for about one year.  Dr. Efird assessed

-23-

Plaintiff with a GAF of 50-60.

Dr. Cogbill found Plaintiff would be able to perform unskilled work, and was only moderately limited in seven out of twenty categories. In her Psychiatric Review Technique form, Dr. Cogbill found no evidence of marked or severe impairment. Finally, Dr. Maria C. Melo, a treating physician at Ozark Guidance, Inc., reported that Plaintiff had been taking Ritalin, which helped some with energy, but that it was causing auditory hallucinations and some paranoia. Dr. Melo reported that she was not sure there was a clear indication for Ritalin and that Plaintiff did not have a clear history of Attention Deficit Disorder. Dr. Melo was going to have Plaintiff try Prozac, since she had a good response to it in the past. The Court notes that between April 23, 2009 and June 15, 2009, Plaintiff reported to Dr. Diesnner that she was doing better, and in November of 2009, Dr. Melo reported that Plaintiff was less dysphoric, there was no clear evidence of inattention, and she did not have any memory deficits. In light of the inconsistencies between Dr. Diessner's mental assessments and those of both examining and non-examining consultants, the Court finds that the record as a whole supports the ALJ's RFC assessment relating to Plaintiff's mental capacity - that she is capable of unskilled work.

With respect to Plaintiff's physical RFC, since Dr. Diessner's specialty is psychiatry, the Court agrees that his assessment regarding Plaintiff's physical RFC should be given little, if any, weight. More weight is to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 416.927(d)(5). Dr. Magness, an examining physician, assessed Plaintiff as having moderate to severe limitations in her ability to handle and only moderate limitation in her ability to walk and carry. Although the ALJ's RFC assessment states Plaintiff can frequently handle, the positions

-24-

the ALJ found Plaintiff was capable of performing require only occasional handling.  The Court

finds that the record as a whole supports the ALJ's RFC assessment relating to Plaintiff's physical

capacity - that she is capable of light work with certain limitations.

**D.  Hypothetical Question to VE:**

In the first hypothetical proposed by the ALJ to the VE, the ALJ stated:

> Please assume a hypothetical person younger individual, with high school
> education and the same work history as the claimant.  This person can
> occasionally lift/carry 20 pounds and frequently 10 pounds.  She can sit for
> 6 hours and can stand/walk for 6 hours.  She must avoid concentrated
> exposure to fumes, odors, dusts, gases, etc.  She can frequently handle.
> Fingering is not limited.  She can do work where interpersonal contact is
> incidental to the work performed.  Complexity of tasks is learned and
> performed by rote, with few variables and little judgment required.
> Supervision required is simple, direct, and concrete.  Assume there is no
> past relevant work to which the person can return and that transferable
> skills are not an issue.  Are there jobs in the national and regional economy
> this person can do?  If so, please list examples, three if possible, along
> with DOT identification, and relevant numbers in the state and national
> economies.

(Tr,. 196-197).  In response to the first hypothetical, the VE gave three positions that would be

available - call out operator, office clerk, and counter clerk.  The ALJ then gave the VE a second

hypothetical, as follows:

> Please change the limitations as follows: Reduce the ability to handle to
> occasionally.  Otherwise, the limitations in the first hypothetical remain
> the same.  With these limitations, would there be jobs?  If so, please give
> examples, three if possible, and relevant numbers.

(Tr. 198).  In response, the VE reported that the three occupations listed above required the ability

to only handle occasionally.  (Tr. 198).

The Court believes the hypothetical questions the ALJ proposed to the VE fully set forth

the impairments which the ALJ accepted as true and which were supported by the record as a

-25-

whole.  See Goff v. Barnhart, 421 F.3d 785, 794 (8ᵗʰ Cir. 2005).  The Court further believes that the VE's responses to the hypothetical questions constitute substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing light work with certain limitations as a call out operator, office clerk, and counter clerk.  Pickney v. Chater, 96 F.3d 294, 296 (8ᵗʰ Cir. 1996)(testimony from VE based on properly phrased hypothetical question constitutes substantial evidence).

**V.     Conclusion:**

Accordingly, the Court hereby affirms the ALJ's decision and dismisses Plaintiff's case with prejudice.

DATED this 22ⁿᵈ day of March, 2012.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)